1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY, State Bar No. 162823
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5960
    Fax:  (415) 703-1234
8   Email:  Juliet.Haley@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15  **JUAN CARLOS QUEZADA,**                    C 08-2421 PJH (PR)

                                    Petitioner,   **RESPONDENT'S ANSWER**
16                                                **TO THE COURT'S ORDER**
                                                  **TO SHOW CAUSE**
17        **v.**

    **DERRYAL G. ADAMS, Warden,**
18
                                    Respondent.
19

20

21          Respondent hereby provides this Answer to the Order to Show Cause why the petition

22  should not be granted.

23                                  **I.**

24                                **CUSTODY**

25          Petitioner Juan Carlos Quezada  is lawfully in the custody of respondent within the

26  meaning of the federal habeas corpus statute, 28 U.S.C. §§ 2241(c)(3) and 2254(d), pursuant to a

27  valid judgment of the Santa Clara County Superior Court, a court having found petitioner guilty

28  of  attempted robbery and personal use of a  firearm.   Petitioner was sentenced to state prison for

1    a term of twelve years.

2                                **II.**

3                        **PROCEDURAL ISSUES**

4            Petitioner has exhausted his state remedies.  The petition is timely.  28 U.S.C. §

5    2244(d).

6                                **III.**

7                        **DENIAL OF CLAIMS**

8            Respondent denies that petitioner suffered any deprivation of constitutional rights

9    supporting habeas corpus relief.  Specifically, respondent denies that the line up was suggestive

10   and denied petitioner due process.  Respondent also denies that the prosecutor's examination was

11   improper and resulted in the denial of a fair trial.

12           Respondent denies that these claims entitle petitioner to relief because he has failed to

13   establish that the state court's denial of these claims was either an unreasonable application of

14   clearly established Federal law as determined by the United States Supreme Court or resulted in

15   a decision based on an unreasonable determination of the facts in light of the evidence presented

16   to the state courts.  Respondent incorporates by reference the accompanying memorandum of

17   points and authorities in support of this denial.

18                                **IV.**

19                     **TRANSCRIPTS AND RECORDS**

20           Copies of  the transcript of petitioner's trial together with copies of  the briefs filed on

21   direct appeal have been lodged with this Court.  These documents constitute all relevant

22   documents and hearing transcripts necessary for this Court's decision.  So far as respondent is

23   aware, all relevant state reported proceedings have been transcribed.  Rule 5, Rules Governing

24   Section 2254 Case.

25   ///

26   ///

27   ///

28

Respondent's Answer To The Court's Order To Show Cause - *Quezada v. Adams* - C 08-2421 PJH (PR)

1

**CONCLUSION**

2
Accordingly, respondent respectfully requests that the petition be denied with prejudice.

3
Dated:  September 3, 2008

4
Respectfully submitted,

5
EDMUND G. BROWN JR.
Attorney General of the State of California

6
DANE R. GILLETTE
Chief Assistant Attorney General

7
GERALD A. ENGLER
Senior Assistant Attorney General

8

9
PEGGY S. RUFFRA
Supervising Deputy Attorney General

10

11
/s/ Juliet B. Haley

12
JULIET B. HALEY
Deputy Attorney General
Attorneys for Respondent

13

14
JBH;jw

15
20137874.wpd
SF2008200098

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Juan Carlos Quezada v. Derryal G. Adams, Warden**

No.:    **C 08-2421 PJH (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>September 3, 2008</u>, I served the attached

**RESPONDENT'S ANSWER TO THE COURT'S ORDER TO SHOW CAUSE;**

**RESPONDENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER;**

**NOTICE OF LODGING OF, AND INDEX TO, EXHIBITS**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Juan Carlos Quezada**
**V-54555**
**CSP**
**4B-3L-14L**
**P.O. Box 3481**
**Corcoran, CA 93212**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on September 3, 2008, at San Francisco, California.

|  |  |
|---|---|
| J. Wong | |
| Declarant | Signature |

20139208.wpd

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5960
8  Fax: (415) 703-1234
     Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

**JUAN CARLOS QUEZADA,**                    C 08-2421 PJH (PR)

14                                  Petitioner,

15

          **v.**

16

**DERRYAL G. ADAMS, Warden,**

17                                  Respondent.

18

19

**RESPONDENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
20                              **OF ANSWER**

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5960
8  Fax: (415) 703-1234
     Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13
   **JUAN CARLOS QUEZADA,**                    C 08-2421 PJH (PR)
14
                              Petitioner,
15                                             **RESPONDENT'S**
                                               **MEMORANDUM OF POINTS**
        **v.**                                 **AND AUTHORITIES IN**
16                                             **SUPPORT OF ANSWER**
   **DERRYAL G. ADAMS, Warden,**
17
                              Respondent.
18

19

20               **STATEMENT OF THE CASE**

21          On August 20, 2004, a Santa Clara County jury convicted petitioner Juan Carlos Quezada

22  of attempted robbery (Cal Penal Code, §§ 664/211-212.5, subd. (c)), and found that during the

23  attempted robbery he personally used a handgun (Cal. Penal Code, § 12022.53, subd. (b)).  CT 44-

24  46. On October 18, 2004, petitioner was sentenced  to state prison for 12 years.  CT 135-136.

25          On November 15, 2006, the state appellate court affirmed the judgment in an unpublished

26  opinion.  Exh. C.  On February 7, 2007, the California Supreme Court denied petitioner's petition

27  for review.

28

1

**STATEMENT OF FACTS**

2          The state court of appeal found the facts to be as follows.  This summary constitutes a

3    factual finding that is presumed correct under 28 U.S.C. § 2254(e)(1).  *Hernandez v. Small,* 282

4    F.3d 1132, 1135 n. 1 (9th Cir. 2002).

5          **The Prosecution's Case**

6    On December 21, 2003, around 5:00 p.m., Hung Ngo left the Garden City Casino in
     Saratoga with about $1,060 in cash and walked to his car. He had been gambling on and
7    off for about 24 hours. When Ngo opened his car door, someone hit him and pushed him
     into it. Ngo looked back and saw a man pointing a gun, who demanded money and
8    threatened to kill him. Ngo told him to put the gun away and calm down and offered to
     give him money. The man punched Ngo, told him to hurry up, and repeated his threat. At
9    that point, Ngo grabbed the gun, pushed it down, and started yelling. His elbow hit the car
     horn and sounded it. The man said he would leave if Ngo stopped yelling, but Ngo
10   continued, and the man ran off. At trial, Ngo, who admitted having passed bad checks in
     1998, testified that although he looked at the gun, he got a good look at the man's face,
11   and he identified defendant.

12   Ebony Brown, a security guard at Garden City Casino, responded to Ngo's screams. Ngo
     told her what had happened and pointed toward where the man had fled. Brown saw a
13   muscular man running away. He was around 5 feet 8 inches tall, and was wearing a black
     cap and black shirt. Brown called her supervisor Terry Thorb and took a statement from
14   Ngo. Ngo said the man was around 5 feet 5 or 6 inches tall and 160 pounds, twice Ngo's
     build, and wore a cap and dark green or blue upper clothing.

15
     Thorb arrived and spoke to Ngo. Thorb called Dennis Imperial, the surveillance camera
16   operator, who compiled a composite videotape of recordings from several cameras during
     the pertinent time frame.[FN1] Among other things, the videotape shows Ngo receiving
17   money from the cashier, walking toward the front door of the casino, exiting, and heading
     out into the parking lot. The videotape also shows a stocky man wearing a black jacket
18   zipped up to his neck and a black baseball cap down low on his head. The man is walking
     not far behind Ngo all the way through the lobby, out the front doors, and into the parking
19   lot.

20       FN1. The tape was shown to the jury with Imperial's narration.

21   That night, Imperial made three still photographs from the videotapes that focused on the
     man who appeared to be following Ngo.
22
     Thorb reviewed the videotape and determined that defendant left the casino 10 seconds
23   after Ngo. He testified that he showed Ngo one of the photographs from the videotape.

24   Officer Allan De La Cruz of the San Jose Police Department arrived at the casino. He
     obtained the surveillance photographs and spoke to Ngo about the incident. According to
25   Officer De La Cruz, Ngo described his assailant as "either Asian or Hispanic,
     approximately six foot, 180 pounds, wearing dark clothing, dark baseball cap." [FN2]
26
              FN2. At trial, Ngo testified that to him "Asian" means someone from China, the
27            Middle East, or Mexico, that is, someone who is not very dark or very light in
              complexion with brown eyes. He thought Mexico was in Asia.
28

1   Ngo testified that police showed him two or three photographs, and the man leaving the casino in one of them matched the general build and profile of his assailant, but it was
2   difficult to tell because the picture was not very clearly developed. Officer De La Cruz later showed the photographs to casino employees, and one employee, Gordon James
3   Halemano, recognized defendant and said they had been in the same work furlough program together. Officer De La Cruz later obtained a photograph of defendant's face
4   from the work furlough program.

5   Halemano, who admitted a prior conviction for failing to register as a sex offender, testified that defendant was in the casino that night and stopped by to see him. After a
6   brief conversation, defendant went to a black jack table in the area where mostly Asian people play. Halemano said that the photograph Officer De La Cruz obtained from the
7   work furlough program showed defendant's facial features more clearly than the surveillance photograph.

8
9   A few days after the incident, Detective Ed Perea and John Mitchell met with Ngo and showed him a six-person photographic lineup of Hispanic men, including defendant.
    Detective Mitchell did not know the identity of the suspect or the position of defendant's
10  photograph in the lineup. He told Ngo that his assailant may or may not be shown. Ngo picked defendant's photograph, saying he was "positive." At trial, Ngo reviewed the six-
11  photograph lineup and said he was 100 percent positive of his identification.[FN3]

12          FN3. When reminded of his description of the assailant, Ngo testified that it
                would not change his identification if he learned that defendant is 5 feet 11
13              inches tall and weighs over 250 pounds.

14  After Ngo's identification, Detective Perea arrested defendant at his home and searched his room, finding, among other things, two dark baseball caps, a black pullover jacket, and
15  blue jeans.        *The Defense*

16  Defendant testified that he went to the casino around 4:45 p.m. to pass some time before meeting a friend at 5:30 p.m. at Exotica, a gentlemen's club across the street. He left for
17  Exotica around 5:10 or 5:20 p.m. and did not hear anything unusual in the parking lot. He got to the club but then ran back to his truck to get his wallet. He drove to Exotica, where
18  he had some drinks with his friend and watched football.

19  Defendant denied seeing Ngo inside the casino, having a gun, or trying to rob Ngo. He opined that his closeness to Ngo inside the casino and later in the parking lot were simply
20  coincidences.

21  Exh C, at 2-4.

22                          **STANDARD OF REVIEW**

23          A federal court may grant a writ of habeas corpus to a state prisoner only if the state

24  court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

25  of, clearly established Federal law, as determined by the Supreme Court of the United States" or

26  were "based on an unreasonable determination of the facts in light of the evidence presented" in the

27  state courts.  28 U.S.C. § 2254(d).  Under the "contrary to" clause, a state court's decision is

28  contrary to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts

Respondent's Memorandum Of Points And Authorities In Support Of Answer - *Quezada v. Adams* - C 08-2421 PJH (PR)

a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. *Carey v. Musladin,* 127 S.Ct. 649, 653-54 (2006) (denying habeas relief in absence of clearly established federal law).

In order to warrant habeas relief, the state court's application of clearly established federal law must not be merely erroneous, incorrect, or even "clear error," but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Williams v. Taylor*, 529 U.S. at 409; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). It is the habeas petitioner's burden to make that showing. *Woodford,* at 25. In the same way, a "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 357 U.S. 322, 340 (2003). State court factual determinations are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies overturning the conviction only if the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error review conducted by the state courts. *Fry v. Pliler*, ___ U.S. ____ , 127 S.Ct. 2321 (2007).

///
///
///
///
///
///
///

1

**ARGUMENT**

2

**I.**

3

4

**THE STATE COURT WAS NOT UNREASONABLE IN REJECTING QUEZADA'S ASSERTION THAT HIS DUE PROCESS RIGHTS WERE VIOLATED BY THE SINGLE PHOTO LINE UP**

5

Petitioner contends the "use of an unduly suggestive single photograph identification

6

procedure violated [his] rights to due process of law." This claim was reasonably rejected by the

7

state courts.

8

**A.    Factual Background And Analysis By The State Court**

9

The state court of appeal summarized the relevant facts regarding the line up as follows:

10

11

12

Prior to trial, defendant moved to exclude evidence against him, including his identification by Ngo before and later at the preliminary hearing, on the ground that all of the evidence was obtained by use of an unduly suggestive identification procedure: showing Ngo the still photographs derived from the videotape. Defendant now contends the court erred in denying his motion.

13

*The Preliminary Hearing And Ruling By The Court*

14

15

16

17

18

19

20

At the preliminary hearing, Ngo recounted the incident in much the same way he did at trial. He said that it was still light out when the incident occurred. The incident lasted two to three minutes. From his position in the car, he very clearly saw a small gun and the perpetrator's face, which was about one to two feet away. He testified that the person was very large and that after the incident he told a police officer that the person was about the same size as the officer and wore a dark blue or black baseball cap and a dark shirt. At that time, someone in a uniform placed three surveillance photographs on a police car and asked whether it showed the person who had attempted to rob him. The person who showed the photographs did not tell Ngo that the person had been following him; nor did he say that the person was a suspect. Ngo immediately recognized the person's face.[FN4] Ngo testified that two weeks after the incident, police showed him a photographic lineup of six men, including defendant, and he identified defendant. At the hearing, Ngo again identified defendant.

21

22

FN4. It is not clear which, if any, of the photographs later introduced at trial was the photograph to which Ngo was referring. Indeed, Ngo testified that the photograph showed the person "about a[n] arm's length behind" him. However, none of the three photographs later introduced at trial include Ngo.

23

24

25

26

In denying defendant's motion to suppress, the court rejected his claim that showing Ngo the photographs in the parking lot was unduly suggestive. In particular, the court found nothing so inherently prejudicial in showing the photographs to Ngo that a jury could not evaluate all of the eyewitness evidence and arrive at a verdict. The court also opined that Ngo might have been shown the photographs at that time because police and security guards were trying to rule out other people who might have been detained.

27

Exh. C, at 5.

28

The state appellate court then rejected the claim after conducting the following analysis:

In *Simmons v. United States* (1968) 390 U.S. 377 ( *Simmons* ), the United States Supreme Court held that a pretrial identification procedure that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates the defendant's right to due process of law. (*Id.* at p. 384.) The court explained that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." (*Simmons, supra,* 390 U.S. at pp. 383-384, fns. omitted.)

''In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.'' [Citation.]" (*People v. Kennedy* (2005) 36 Cal.4th 595, 608, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 989; see *Simmons, supra,* 390 U.S. at pp. 384-385 [totality of circumstances].) "If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242, disapproved on other grounds in *People v. Edwards* (1991) 53 Cal.3d 787, 835.)

Whether a procedure is unduly or unnecessarily suggestive and unreliable presents a mixed question of law and fact. A reviewing court accepts the relevant historical facts found by the trial court when supported by substantial evidence and then independently determines suggestiveness and reliability. (*People v. Kennedy, supra,* 36 Cal.4th 595, 608-609.)

The facts in *Simmons* provide a helpful guide for our analysis. There, two men entered a savings and loan and robbed the teller at gun point and drove away. Police found a car matching the description and traced it to Simmons's sister-in-law, who said she had loaned it to her sibling brother, codefendant Andrews. From another sister, police obtained photographs showing both defendants with other people. The photographs were then shown to five bank tellers who witnessed the robbery. All identified the defendant Simmons. (*Simmons, supra,* 390 U.S. at p. 380.)

Concerning that identification procedure, the court opined that the procedure was reasonable under the circumstances because a serious felony had been committed, the perpetrators were at large, and the inconclusive evidence they had led to Andrews and Simmons. "It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities." (*Simmons, supra,* 390 U.S. at p. 385.)

1

2

3

4

5

6

7

8

9

10

Concerning reliability, the court opined that there was little chance that the identification procedure led to misidentification of Simmons because the robbery took place in a well-lighted place; the robbers wore no masks; five employees had seen the robber identified as Simmons for up to five minutes; each teller separately was shown the photographs only a day later, while their memories were still fresh; and the witnesses were not told anything about the investigation or given the suggestion that the persons in the photographs were under suspicion. Under these conditions, all five eyewitnesses identified Simmons as one of the robbers. None identified Andrews, who apparently was as prominent in the photographs as Simmons. These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial. (*Simmons, supra,* 390 U.S. at pp. 385-386.) "Notwithstanding cross-examination, none of the witnesses displayed any doubt about their respective identifications of Simmons. Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some respects fallen short of the ideal. We hold that in the factual surroundings of this case the identification procedure used was not such as to deny Simmons due process of law...." (*Ibid.*, fn. omitted; see also *People v. Kennedy, supra,* 36 Cal.4th at p. 608 .)

11

12

On appeal, defendant bears the burden of showing that the initial identification procedure was unduly suggestive, and he must show that it was unfair as a "demonstrable reality, not just speculation ." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222; *People v. Hunt* (1977) 19 Cal.3d 888, 893-894.)

13

14

15

In claiming that the initial display of surveillance photographs was unduly suggestive, defendant notes that the photographs essentially showed only one person, and they were displayed on a police car by a uniformed person. He further asserts that the procedure was unnecessary because the police had not detained anyone and thus had no need to promptly determine whether the person in the photograph should be considered a suspect.

16

17

18

19

20

21

22

23

24

Although the use of single person, voice, or photo identification procedures in certain circumstances has been condemned as suggestive (see *Stovall v. Denno* (1967) 388 U.S. 293, 302, implicitly overruled on other grounds in *Griffith v. Kentucky* (1987) 479 U.S. 314, 320, 326-327; *Forster v. California* (1969) 394 U.S. 440, 443, *In re Hill* (1969) 71 Cal.2d 997, 1004; *People v. Contreras* (1993) 17 Cal.App.4th 813, 819), courts have not found those procedures to be inherently unfair. (*People v. Ochoa* (1998) 19 Cal.4th 353, 413; *People v. Clark* (1992) 3 Cal.4th 41, 136; *People v. Floyd* (1970) 1 Cal.3d 694, 714, overruled on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.) This is so because promptly showing the victim or witness a person who has been apprehended close in time and place to the offense permits timely identification, enhances reliability, and excludes from consideration innocent persons. (*People v. Floyd, supra,* 1 Cal.3d at p. 714; *In re Carlos M.* (1990) 220 Cal.App.3d 372, 386; see, e.g., *Stovall v. Denno, supra,* 388 U.S. 293, 302 [single-person showup upheld where the hospitalized victim was the only person who could exonerate suspect].) Rather, single person showup procedures are considered unfair when they are not neutral and unnecessarily suggest to the witness in advance the identity of the person suspected by the police. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 123; *People v. Ochoa, supra,* 19 Cal.4th at p. 412; *People v. Slutts* (1968) 259 Cal.App.2d 886, 891.)

25

26

27

28

Here, we find that displaying the surveillance photographs was reasonable under the circumstances. They showed a person following Ngo through the lobby of the casino, out the door, and into the parking lot just moments before the attempted robbery took place. The perpetrator was still at large, and showing the pictures to Ngo could have helped police to quickly determine whether to investigate the identity of the man in the photographs and then search for him or completely eliminate him as a potential suspect

1   and focus the investigation on other people who may be visible in the videotapes.
    Moreover, there is no evidence that anyone suggested to Ngo that he should identify the
2   person in the photographs. As Ngo testified, no one said that the person was a suspect or
    was even the person who followed him out of the casino. Ngo was simply asked whether
3   the photographs showed the person who attempted to rob him. Under the circumstances,
    we do not find that having a uniformed person display the photographs on a police car
4   unduly or unnecessarily suggested that the police thought the person was the perpetrator
    or created pressure on Ngo to identify him. (Compare with *People v. Contreras, supra,*
5   17 Cal.App.4th at pp. 819-820.)

6   Defendant claims the initial identification was unreliable because (1) Ngo's view of the
    perpetrator's face was partially obscured by the gun; (2) the lights in the parking lot were
7   not turned on; (3) Ngo "was in a state of extreme stress, having been gambling at the
    casino on and off for a twenty-four hour period immediately prior to the incident"; and
8   (4) Ngo could only provide a vague, general description of the perpetrator.

9   Ngo said he saw the perpetrator's face very clearly at close range in natural light for
    between one and two minutes. He had never seen him before. He said the person wore a
10  dark baseball cap and dark shirt. Shortly after the incident, while Ngo's memory was fresh,
    he was shown photographs that depicted a man in a dark cap and dark jacket. Ngo
11  immediately recognized and identified the man as the perpetrator. Although Ngo admitted
    that he had been gambling on and off for 24 hours and did not sleep, he nevertheless said
12  that he was sober and awake and had eaten and drank coffee sometime before the incident.
    Finally, there is no evidence that Ngo's eyesight may have been impaired by fatigue,
13  panic, trauma, anxiety, or stress.

14  The reliability of Ngo's initial identification is further bolstered by the fact that the
    photographs were taken from videotapes, and those videotapes clearly and unmistakable
15  show a man in a dark jacket and black cap closely following Ngo through the lobby, out
    the front door, and into the parking lot just moments before the attempted robbery
16  occurred. That man was later identified by an acquaintance as defendant, and defendant
    admitted he was at the casino.

17
    Last, we note that the photographs provide only a blurry, partial view of the man's face
18  and do not show his eyes, forehead, or hair. Although the photographs were enough for
    Ngo to identify the man at the time, they do not show enough facial detail to single out
19  defendant and positively eliminate the other five men in the six-person photographic
    lineup that was later shown to Ngo. That lineup was composed of clear, full-facial
20  photographs of men of similar age with similar facial hair and haircuts. Although
    defendant could be the person in the surveillance photographs, he is not the only possible
21  candidate. Thus, we consider it highly unlikely that the surveillance photographs could
    have so clearly linked defendant's face to that of the perpetrator in Ngo's memory that Ngo
22  would inevitably select defendant from among similar looking men in the photo lineup.
    Rather, the more reasonable explanation for Ngo's later certainty at the multi-person
23  lineup was that the greater facial detail matched Ngo's actual memory of the man he saw
    during the incident.
24
    In sum, we conclude that the initial identification procedure was not unduly suggestive
25  and unfair and did not create "a very substantial likelihood of irreparable
    misidentification." (*Simmons v. United States, supra,* 390 U.S. at p. 384.) Accordingly,
26  the trial court properly denied defendant's motion to suppress.

27  Exh. C, at 5-11.

28

**B.   The State Court's Analysis Was Reasonable**

Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. *See Neil v. Biggers,* 409 U.S. 188, 93 (1972). Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Simmons v. United States*, 390 U.S. 377 (1968); *see also Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986).

Here, the state court identified and applied the relevant Supreme Court authority and reasonably rejected petitioner's claim.  As the state court determined, the single photo showup was not inherently unfair because it allowed for prompt identification of a suspect, would exonerate the innocent, and aid in discovering the guilty party.   Any potential unfairness was offset by the likelihood that a prompt identification within a short time after the commission of the crime would be more accurate that an identification days or weeks later.  Moreover, there was nothing in the procedure followed here to indicate any impropriety in the single photograph shown to Ngo.  The photo was not even clear enough to be unduly suggestive.

The state court's conclusion that the identification was reliable was also a reasonable application of *Simmons*.  Ngo testified that it was still light outside and he could see.  He saw his assailant's face when he was pushed into his car.  Ngo saw his assailant's face from about a foot away or an arm's length away.  Last, we note that  the trial court gave the jury CALJIC Nos. 2.91 and 2.92, which advised the jury to consider the circumstances of the identifications, and if they had a reasonable doubt as to the identifications, find petitioner not guilty. They also advised that the jury should consider the ability of the witnesses to identify the suspect in a photographic lineup. CT 85-86.  These instructions adequately informed the jury to evaluate the entire identification process in considering the eyewitnesses testimony.

In sum, it cannot be said that the state court was unreasonable in rejecting petitioner's claim.  No relief is warranted.

Respondent's Memorandum Of Points And Authorities In Support Of Answer - *Quezada v. Adams* - C 08-2421 PJH (PR)

## II.

**THE STATE COURT REASONABLY REJECTED QUEZADA'S CLAIM THAT HE WAS DENIED DUE PROCESS BY THE PROSCUTOR'S ALLEGED VOUCHING FOR A WITNESS**

Petitioner contends the prosecutor committed misconduct by invoking the power of her office to bolster the credibility of the key prosecution witness. This claim too was reasonably rejected by the state court.

**A.    Background**

During his closing argument, defense counsel attacked Ngo's description of his assailant:

He [Ngo] kept saying that he noticed his eyes. Well, he said that this person was Asian. But he also said, if you remember, that he didn't make any distinction in an Asian person's eyes than any other race of a person. Well, to me, that seems to be that the prosecution coached him to an absurdity.

(Augmentation to Reporter's Transcript, ART, 27.)

During the prosecutor's rebuttal argument, this exchange occurred:

[PROSECUTOR:] The next defense theme is that the victim was coached, that at the break, I said oh my God, I sat him down, we're having problems with this case. Okay. Here's what you're gonna say. Do you really think that happened? *Do you really think that, not sounding defensive, but just addressing the defendant's argument, that I would risk my position, my reputation, perhaps, my  --*

[DEFENSE COUNSEL]: Objection. Improper argument.

THE COURT:  The objection is overruled.

[PROSECUTOR]: *Perhaps my license, to practice, to sit down a victim during the lunch hour and coach him as to what to say?* Do you really think that's what happened? And let me remind you, I didn't ask for that break. It wasn't that at the end of the victim's cross examination, I asked the judge, and I said, Can we take a break at this time? Because I really need it to talk to somebody about something. It happened to be the lunch break. I was prepared to go up and on the stand and ask him, what do you consider Asian? I wish that was a  question that had been asked by Officer De la Cruz when he heard Asian and Hispanic. The two seemed contradictory. I wish he asked. He didn't. I asked.

As the victim told you, what did the prosecutor ask you? Isn't it true she discussed problems with the case, isn't it true, isn't it true that? She [sic] said she asked me what I considered to be Asian. He also said she told me to be as detailed as possible and to be truthful. That's what we do.

Keep in mind if the victim's testimony had been perfect, no inconsistencies, everything matched describing the defendant to a T, that would have given you some indication that oh, he was probably coached, or he was reminded. He was shown pictures. This is the guy; right? Look at what he was wearing, reminding him. The fact that he did

1   have variances is because he was going surely by memory. It wasn't anybody in the
2   process along the way trying to remind him or coach him or lead him along, yet he still
    remembers the face, and that's what's important. He has no doubt. And again, neither
3   should you.

(ART 42, italics added.)

4

5   **B.    The State Court's Analysis Of The Claim**

6           The state court rejected the claim reasoning as follows:

7   The prosecutor is given wide latitude to vigorously argue the fact and law and respond to
    defense counsel's arguments as long as argument amounts to fair comment on the
8   evidence. (*People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Lucas* (1995) 12
    Cal.4th 415, 473.) ''A prosecutor's conduct violates the federal Constitution when it
9   "infects the trial with such unfairness as to make the conviction a denial of due process."
    [Citations.] "Conduct by a prosecutor that does not render a criminal trial fundamentally
10  unfair is prosecutorial misconduct under [California] law only if it involves the use of
    deceptive or reprehensible methods to attempt to persuade either the trial court or the
11  jury." [Citation.]'' " (*People v. Hinton* (2006) 37 Cal.4th 839, 862-863; *People v.
    Espinoza* (1992) 3 Cal.4th 806, 820.)

12  It is settled that "[a] prosecutor is prohibited from vouching for the credibility of witnesses
    or otherwise bolstering the veracity of their testimony by referring to evidence outside the
13  record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind
    a witness by offering the impression that she has taken steps to assure a witness's
14  truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding
    the apparent honesty or reliability of prosecution witnesses are based on the ''facts of
15  [the] record and the inferences reasonably drawn therefrom, rather than any purported
    personal knowledge or belief,'' her comments cannot be characterized as improper
16  vouching. [Citations.]" (*People v. Frye* (1998) 18 Cal .4th 894, 971; *People v. Turner*
    (2004) 34 Cal.4th 406, 432-433.)

17

18  When a statement by the prosecutor is challenged as misconduct, we examine the
    prosecutor's statement in the context of the whole argument and all the instructions in
19  order to determine whether there is a reasonable likelihood the jury construed or applied
    the statement in an objectionable way. (*People v. Morales* (2001) 25 Cal.4th 34, 44;
20  *People v. Hill, supra,* 17 Cal.4th at p. 832.) "In conducting this inquiry, we ''do not lightly
    infer'' that the jury drew the most damaging rather than the least damaging meaning from
21  the prosecutor's statements." (*People v. Frye, supra*, 18 Cal.4th at p. 970; *Donnelly v.
    DeChristoforo* (1974) 416 U.S. 637, 647.)

22  The prosecutor's comments were not focused on Ngo's testimony but rather on defense
    counsel's argument and suggestion that the prosecutor had coached him. The prosecutor
23  simply denied doing so and asked jurors to wonder whether she would risk her reputation
    and job by coaching a witness. That response to defense counsel did not reasonably
24  represent the prosecutor's personal assurance of Ngo's veracity or place the prestige of the
    district attorney's office behind Ngo, and we do not find a reasonable likelihood the jury
25  understood the prosecutor's rebuttal in those ways. Accordingly, we find no misconduct.

26  Defendant's reliance on *U.S. v. Witherspoon* (9th Cir.2005) 410 F.3d 1142, 1146 and *U.S.
    v. Combs* (9th Cir.2004) 379 F.3d 564, 574-576, is misplaced. In both *Witherspoon* and
27  *Combs,* the prosecutors impermissibly vouched for the credibility the law enforcement
    officers witnesses by arguing that the officers would lose their jobs and more if they
28  committed perjury. Although here the prosecutor made a similar argument about

1   potentially losing her job, she was not vouching for the credibility of a witness; she
2   rebutting a charge that she had coached Ngo. Thus, we find *Witherspoon* and *Combs* to
    be inapposite.

3   Exh C, at 12-14.

4   **C.   The State Court's Analysis Was Reasonable**

5
6           It is well established that a prosecutor may not vouch for the credibility of a witness.
7   *United States v. Sanchez,* 176 F.3d 1214, 1224 (9th Cir. 1999); *United States v. Lopez*, 803 F.2d 969,
8   973 (9th Cir.1986) (improper to suggest that witness found credible by the grand jury should
9   therefore be credible to the trial jury).   Prosecutorial misconduct occurs when a prosecutor vouches
10  for the credibility of a witness by giving personal assurances of the witness's truthfulness or
11  suggesting that there is information not presented to the jury which supports the witness's testimony.
12  *See Berger v. United States,* 295 U.S. 78, 86-88 (1935); *see also Lawn v. United States*, 355 U.S.
13  339, 359-60 n. 15 (1958). Such vouching is misconduct because it poses two dangers: it may lead
14  the jury to convict on the basis of evidence not presented, and it carries with it the imprimatur of the
15  government. See *United States v. Young*, 470 U.S. 1, 18 (1985). To warrant habeas relief,
16  prosecutorial vouching must so infect the trial with unfairness as to make the resulting conviction
17  a denial of due process. *Davis v. Woodford,* 384 F.3d 628, 644 (9th Cir.2004).

18          Judged by these principles it is clear that the state court's rejection of petitioner's claim
19  was not unreasonable.  As the state appellate court noted, *United States v. Witherspoon*, 410 F.3d
20  1142, 1146 (9th Cir. 2005), and *United States v. Combs*, 379 F.3d 564, 574-576 (9th Cir. 2004) are
    inapposite.

21          In *Witherspoon*, the court found that the prosecutor had impermissibly vouched for the
22  credibility of testimony of law enforcement officers when she argued that the officers risked losing
23  their jobs and their pensions, and prosecution for perjury if they lied.  *United States v. Witherspoon,*
24  410 F.3d at 1146.

25          In *Combs*, the court found impermissible vouching because the prosecutor had argued that
26  "in order to acquit [the defendant], the jury had to believe that [the DEA] agent risked losing his job
27  by lying on the stand" and implied  that she knew the agent "would be fired for committing perjury

28

1 | and that she believed no reasonable agent in [her] shoes would take such a risk." *United States v.*

2 | *Combs*, 379 F.3d at 574.

3 | In this case, unlike the situations in *Witherspoon* and *Combs*, the prosecutor did not vouch

4 | for the credibility of any witness or place the prestige of her office behind any witness's testimony.

5 | The prosecutor clearly did not vouch for Ngo's credibility by placing before the jury facts that were

6 | outside the record or seemingly known personally to her.  Nor did her statement place  the

7 | government's prestige behind Ngo's testimony by giving a personal assurance of his veracity.  The

8 | prosecutor rhetorically asked the jury what disincentive she had to coach Ngo.  The prosecutor only

9 | showed an interest in reaching the truth and denied any inference from defense counsel that she was

10 | coaching Ngo. The state court's conclusion to that effect was sound.

11 | Even if the comments were improper, petitioner was not denied a fair trial.  The

12 | prosecutor's comments were brief, and the jury was reminded that it had to decide what the facts

13 | were.  Moreover, the jury was later instructed that statements by counsel are not evidence and that

14 | it was to decide all questions  of fact from evidence received at trial and not from any other source.

15 | and to base its decision on the facts and the law proved from the evidence presented.  The jurors

16 | were also instructed with CALJIC No. 2.20 that they were "the sole judges of the believability of

17 | a witness and the weight to be given the testimony of each witness."  CT 76.  The evidence

18 | established that petitioner followed Ngo from the casino to his car and that Ngo positively identified

19 | him as his assailant on several occasions.  The prosecutor's comment did not render the trial unfair.

20 | For the same reasons, any error was harmless.  Petitioner is not entitled to relief on this claim.

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 |

1

**CONCLUSION**

2

Accordingly, respondent respectfully requests that the petition be denied.

3

Dated:  September 3, 2008

4

Respectfully submitted,

5

EDMUND G. BROWN JR.
Attorney General of the State of California

6

DANE R. GILLETTE
Chief Assistant Attorney General

7

GERALD A. ENGLER
Senior Assistant Attorney General

8

PEGGY S. RUFFRA
Supervising Deputy Attorney General

9

10

/s/ Juliet B. Haley

11

JULIET B. HALEY
Deputy Attorney General

12

Attorneys for Respondent

13

JBH:jw

14

20137879.wpd

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2                                                                                          **Page**

3    STATEMENT OF THE CASE                                                                    1

4    STATEMENT OF FACTS                                                                       2

5    STANDARD OF REVIEW                                                                       3

6    ARGUMENT                                                                                 5

7        I.    THE STATE COURT WAS NOT UNREASONABLE IN
               REJECTING QUEZADA'S ASSERTION THAT HIS DUE
8              PROCESS RIGHTS WERE VIOLATED BY THE SINGLE
               PHOTO LINE UP                                                                  5
9
               A.    Factual Background And Analysis By The State Court                       5
10
               B.    The State Court's Analysis Was Reasonable                                9
11
        II.   THE STATE COURT REASONABLY REJECTED QUEZADA'S
12             CLAIM THAT HE WAS DENIED DUE PROCESS BY THE
               PROSCUTOR'S ALLEGED VOUCHING FOR A WITNESS                                    10
13
               A.    Background                                                              10
14
               B.    The State Court's Analysis Of The Claim                                 11
15
               C.    The State Court's Analysis Was Reasonable                               12
16
     CONCLUSION                                                                              14
17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2                                                                          **Page**

3    **Cases**

4

5    *Berger v. United States*
     295 U.S. 78 (1935)                                                      12

6    *Brecht v. Abrahamson*
     507 U.S. 619 (1993)                                                      4

7

8    *Carey v. Musladin*
     127 S.Ct. 649 (2006)                                                     4

9    *Davis v. Woodford*
     384 F.3d 628 (9th Cir. 2004)                                            12

10

11   *Early v. Packer*
     537 U.S. 3 (2002) (per curiam)                                           4

12   *Fry v. Pliler*
     ___ U.S. ____ , 127 S.Ct. 2321 (2007)                                    4

13

14   *Hernandez v. Small*
     282 F.3d 1132 (9th Cir. 2002)                                            2

15   *Lawn v. United States*
     355 U.S. 339 (1958)                                                     12

16

17   *Lockyer v. Andrade*
     538 U.S. 63 (2003)                                                       4

18   *Miller-El v. Cockrell*
     357 U.S. 322 (2003)                                                      4

19

20   *Neil v. Biggers*
     409 U.S. 188 (1972)                                                      9

21   *Simmons v. United States*
     390 U.S. 377 (1968)                                                      9

22

23   *United States v. Combs*
     379 F.3d 564 (9th Cir. 2004)                                          12, 13

24   *United States v. Lopez*
     803 F.2d 969 (9th Cir. 1986)                                            12

25

26   *United States v. Sanchez*
     176 F.3d 1214 (9th Cir. 1999)                                           12

27   *United States v. Witherspoon*
     410 F.3d 1142 (9th Cir. 2005)                                         12, 13

28

**TABLE OF AUTHORITIES  (continued)**

                                                                    **Page**

*United States v. Young*
470 U.S. 1 (1985)                                                      12

*Van Pilon v. Reed*
799 F.2d 1332 (9th Cir. 1986)                                          9

*Williams v. Taylor*
529 U.S. 362 (2000)                                                    4

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                                        4


**Statutes**


United States Code, Title 28
         § 2254(d)                                                     3
         § 2254(e)(1)                                                 2, 4

California Penal Code
         §§ 211-212.5, subdivision (c)                                1
         § 664                                                        1
         § 12022.53, subdivision (b)                                  1


**Other Authorities**


California Jury Instructions, Criminal
         No. 2.20                                                    13
         No. 2.91                                                     9

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   JULIET B. HALEY, State Bar No. 162823
    Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5960
     Fax:  (415) 703-1234
8    Email:  Juliet.Haley@doj.ca.gov

9   Attorneys for Respondent

10

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14
    **JUAN CARLOS QUEZADA,**                     C 08-2421 PJH (PR)
15
                                 Petitioner,     **NOTICE OF LODGING OF,**
16                                               **AND INDEX TO, EXHIBITS**

17            **v.**

    **DERRYAL G. ADAMS, Warden,**
18
                                 Respondent.
19

20

21          Respondent hereby submits the following exhibits to be lodged with the Clerk of the

22   Court in support of the Answer and supporting memorandum.

23                  **RESPONDENT'S INDEX TO LODGED EXHIBITS**

24          EXHIBIT A:   Clerk's Transcript (Vol. 1 and Augmentation);

25          EXHIBIT B:   Reporter's Transcript (Vol. 1 - Vol. 5, Augmentation);

26          EXHIBIT C:   State Court Opinion;

27          EXHIBIT D:   Appellant's Opening Brief;

28          EXHIBIT E:   Respondent's Brief.

1                Dated:  September 3, 2008

2                                  Respectfully submitted,

3                                  EDMUND G. BROWN JR.
Attorney General of the State of California

4                                  DANE R. GILLETTE
Chief Assistant Attorney General

5

6                                  GERALD A. ENGLER
Senior Assistant Attorney General

7                                  PEGGY S. RUFFRA
Supervising Deputy Attorney General

8

9                                  /s/ Juliet B. Haley

10                                JULIET B. HALEY
Deputy Attorney General

11                                Attorneys for Respondent

12   JBH:jw

13   20137899.wpd
      SF2008200098

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28