UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN CARLOS QUEZADA

        Petitioner,                No. C 08-2421 PJH (PR)

  vs.                                 **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

DERRYAL G. ADAMS, Warden,

        Respondent.

                                  /

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner has not filed an optional traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

Petitioner was convicted by a jury of attempted robbery with personal use of a handgun. Ex. C (court of appeal opinion) at 1.[1] He was sentenced to prison for twelve years. *Id.* He does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

> On December 21, 2003, around 5:00 p.m., Hung Ngo left the Garden City Casino in Saratoga with about $1,060 in cash and walked to his car. He had been gambling on and off for about twenty four hours. When Ngo opened his car door, someone hit him and pushed him into it. Ngo looked back and saw a man pointing a gun, who demanded money and threatened to kill him. Ngo told him to put the gun away and calm down and offered to give him money. The man punched Ngo, told him to hurry up, and repeated

---

[1]Citations to "Ex." are to the record lodged with the court by the Attorney General.

his threat. At that point, Ngo grabbed the gun, pushed it down, and started yelling. His elbow hit the car horn and sounded it. The man said he would leave if Ngo stopped yelling, but Ngo continued, and the man ran off. At trial, Ngo, who admitted having passed bad checks in 1998, testified that although he looked at the gun, he got a good look at the man's face, and he identified defendant.

Ebony Brown, a security guard at Garden City Casino, responded to Ngo's screams. Ngo told her what had happened and pointed toward where the man had fled. Brown saw a muscular man running away. He was around five feet eight inches tall, and was wearing a black cap and black shirt. Brown called her supervisor Terry Thorb and took a statement from Ngo. Ngo said the man was around five feet five or six inches tall and 160 pounds, twice Ngo's build, and wore a cap and dark green or blue upper clothing.

Thorb arrived and spoke to Ngo. Thorb called Dennis Imperial, the surveillance camera operator, who compiled a composite videotape of recordings from several cameras during the pertinent time frame.[2] Among other things, the videotape shows Ngo receiving money from the cashier, walking toward the front door of the casino, exiting, and heading out into the parking lot. The videotape also shows a stocky man wearing a black jacket zipped up to his neck and a black baseball cap down low on his head. The man is walking not far behind Ngo all the way through the lobby, out the front doors, and into the parking lot.

That night, Imperial made three still photographs from the videotapes that focused on the man who appeared to be following Ngo.

Thorb reviewed the videotape and determined that defendant left the casino 10 seconds after Ngo. He testified that he showed Ngo one of the photographs from the videotape.

Officer Allan De La Cruz of the San Jose Police Department arrived at the casino. He obtained the surveillance photographs and spoke to Ngo about the incident. According to Officer De La Cruz, Ngo described his assailant as "either Asian or Hispanic, approximately six foot, 180 pounds, wearing dark clothing, dark baseball cap."[3]

Ngo testified that police showed him two or three photographs, and the man leaving the casino in one of them matched the general build and profile of his assailant, but it was difficult to tell because the picture was not very clearly developed. Officer De La Cruz later showed the photographs to casino employees, and one employee, Gordon James Halemano, recognized defendant and said they had been in the same work furlough program together. Officer De La Cruz later obtained a photograph of defendant's face from the work furlough program.

Halemano, who admitted a prior conviction for failing to register as a

---

[2] The tape was shown to the jury with Imperial's narration.

[3] At trial, Ngo testified that to him "Asian" means someone from China, the Middle East, or Mexico, that is, someone who is not very dark or very light in complexion with brown eyes. He thought Mexico was in Asia.

2

sex offender, testified that defendant was in the casino that night and stopped by to see him. After a brief conversation, defendant went to a black jack table in the area where mostly Asian people play. Halemano said that the photograph Officer De La Cruz obtained from the work furlough program showed defendant's facial features more clearly than the surveillance photograph.

A few days after the incident, Detective Ed Perea and John Mitchell met with Ngo and showed him a six-person photographic lineup of Hispanic men, including defendant. Detective Mitchell did not know the identity of the suspect or the position of defendant's photograph in the lineup. He told Ngo that his assailant may or may not be shown. Ngo picked defendant's photograph, saying he was "positive." At trial, Ngo reviewed the six-photograph lineup and said he was 100 percent positive of his identification.[4].

After Ngo's identification, Detective Perea arrested defendant at his home and searched his room, finding, among other things, two dark baseball caps, a black pullover jacket, and blue jeans.

*The Defense*

Defendant testified that he went to the casino around 4:45 p.m. to pass some time before meeting a friend at 5:30 p.m. at Exotica, a gentlemen's club across the street. He left for Exotica around 5:10 or 5:20 p.m. and did not hear anything unusual in the parking lot. He got to the club but then ran back to his truck to get his wallet. He drove to Exotica, where he had some drinks with his friend and watched football.

Defendant denied seeing Ngo inside the casino, having a gun, or trying to rob Ngo. He opined that his closeness to Ngo inside the casino and later in the parking lot were simply coincidences.

Ex. C at 2-4 [footnotes in original but renumbered].

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[4] When reminded of his description of the assailant, Ngo testified that it would not change his identification if he learned that defendant is five feet eleven inches tall and weighs over 250 pounds.

proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

## DISCUSSION

As grounds for habeas relief, petitioner asserts that his due process rights were violated by unduly suggestive identification procedures and by prosecutorial misconduct.

///

## I.    Unduly Suggestive Pretrial Identification Procedures

Much of the background for this claim is set out above, in the quotation from the California Court of Appeal opinion. The court also provided this additional background:

**SUGGESTIVENESS OF THE PRETRIAL IDENTIFICATION PROCEDURE**

Prior to trial, defendant moved to exclude evidence against him, including his identification by Ngo before and later at the preliminary hearing, on the ground that all of the evidence was obtained by use of an unduly suggestive identification procedure: showing Ngo the still photographs derived from the videotape. Defendant now contends the court erred in denying his motion.

*The Preliminary Hearing and Ruling by the Court*
At the the preliminary hearing, Ngo recounted the incident in much the same way he did at trial. He said that it was still light out when the incident occurred. The incident lasted two to three minutes. From his position in the car, he very clearly saw a small gun and the perpetrator's face, which was about one to two feet away. He testified that the person was very large and that after the incident he told a police officer that the person was about the same size as the officer and wore a dark blue or black baseball cap and a dark shirt. At that time, someone in a uniform placed three surveillance photographs on a police car and asked whether it showed the person who had attempted to rob him. The person who showed the photographs did not tell Ngo that the person had been following him; nor did he say that the person was a suspect. Ngo immediately recognized the person's face. [FN4. It is not clear which, if any, of the photographs later introduced at trial was the photograph to which Ngo was referring. Indeed, Ngo testified that the photograph showed the person "about a[n] arm's length behind" him. However, none of the three photographs later introduced at trial include Ngo.] Ngo testified that two weeks after the incident, police showed him a photographic lineup of six men, including defendant, and he identified defendant. At the hearing, Ngo again identified defendant.

In denying defendant's motion to suppress, the court rejected his claim that showing Ngo the photographs in the parking lot was unduly suggestive. In particular, the court found nothing so inherently prejudicial in showing the photographs to Ngo that a jury could not evaluate all of the eyewitness evidence and arrive at a verdict. The court also opined that Ngo might have been shown the photographs at that time because police and security guards were trying to rule out other people who might have been detained.

Ex. C at 4-5.

### A.    Standard

Petitioner claims that his due process rights were violated by the trial court's denial of his motion to suppress evidence of the on-scene photographic showup and his identification of petitioner at the pretrial hearing.

///

5

In cases involving admission of evidence of pretrial identifications, "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. *Id.* at 196. Identification testimony therefore is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986).

**B.   Analysis**

**1.   "Unnecessarily Suggestive" Factor**

The California Court of Appeal held that showing the victim the surveillance photos was reasonable under the circumstances:

> Here, we find that displaying the surveillance photographs was reasonable under the circumstances. They showed a person following Ngo through the lobby of the casino, out the door, and into the parking lot just moments before the attempted robbery took place. The perpetrator was still at large, and showing the pictures to Ngo could have helped police to quickly determine whether to investigate the identity of the man in the photographs and then search for him or completely eliminate him as a potential suspect and focus the investigation on other people who may be visible in the videotapes. Moreover, there is no evidence that anyone suggested to Ngo that he should identify the person in the photographs. As Ngo testified, no one said that the person was a suspect or was even the person who followed him out of the casino. Ngo was simply asked whether the photographs showed the person who attempted to rob him. Under the circumstances, we do not find that having a uniformed person display the photographs on a police car unduly or unnecessarily suggested that the police thought the person was the perpetrator or created pressure on Ngo to identify him. (Compare with *People v. Contreras, supra*, 17 Cal.App.4th at pp. 819-820.)

Ex. C at 9-10.

As the Court pointed out in *Neil*, admission of a single-person showup does not, without more, violate due process; it is the use of an "unnecessarily suggestive" showup that is impermissible. *Neil*, 409 U.S. at 198-99; *see also Simmons v. United States*, 390 U.S. 377, 385 (1968). Factors that would indicate that the single-person showup is not unnecessary may include whether the crime was a serious felony, whether the perpetrator

6

was still at large, and whether there was reason to believe the person whose photograph was shown to the witness was in fact the offender – this last so that the police can determine if they "are on the right track." *Simmons*, 390 U.S. at 385. These same factors were applied by the California Court of Appeal in the passage quoted above,and in the circumstances here, that court's determination clearly was correct – the identification was not unnecessarily suggestive.

### 2. Reliability

Even an unnecessarily suggestive identification does not violate due process if the identification is sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). As to this factor, the California Court of Appeals said:

> Defendant claims the initial identification was unreliable because (1) Ngo's view of the perpetrator's face was partially obscured by the gun; (2) the lights in the parking lot were not turned on; (3) Ngo "was in a state of extreme stress, having been gambling at the casino on and off for a twenty-four hour period immediately prior to the incident"; and (4) Ngo could only provide a vague, general description of the perpetrator.
>
> Ngo said he saw the perpetrator's face very clearly at close range in natural light for between one and two minutes. He had never seen him before. He said the person wore a dark baseball cap and dark shirt. Shortly after the incident, while Ngo's memory was fresh, he was shown photographs that depicted a man in a dark cap and dark jacket. Ngo immediately recognized and identified the man as the perpetrator. Although Ngo admitted that he had been gambling on and off for 24 hours and did not sleep, he nevertheless said that he was sober and awake and had eaten and drank coffee sometime before the incident. Finally, there is no evidence that Ngo's eyesight may have been impaired by fatigue, panic, trauma, anxiety, or stress.
>
> The reliability of Ngo's initial identification is further bolstered by the fact that the photographs were taken from videotapes, and those videotapes clearly and unmistakably show a man in a dark jacket and black cap closely following Ngo through the lobby, out the front door, and into the parking lot just moments before the attempted robbery occurred. That man was later identified by an acquaintance as defendant, and defendant admitted he was at the casino.
>
> Last, we note that the photographs provide only a blurry, partial view of the man's face and do not show his eyes, forehead, or hair. Although the photographs were enough for Ngo to identify the man at the time, they do not show enough facial detail to single out defendant and positively eliminate the other five men in the six-person photographic lineup that was later shown to Ngo. That lineup was composed of clear, full-facial photographs of men of

1     similar age with similar facial hair and haircuts.  Although defendant could be
2     the person in the surveillance photographs, he is not the only possible candidate.  Thus, we consider it highly unlikely that the surveillance
3     photographs could have so clearly linked defendant's face to that of the perpetrator in Ngo's memory that Ngo would inevitably select defendant from
4     among similar looking men in the photo lineup.  Rather, the more reasonable explanation for Ngo's later certainty at the multi-person lineup was that the
5     greater facial detail matched Ngo's actual memory of the man he saw during the incident.

6 Ex. C at 10-11.

7     The factors identified by the California Court of Appeal as showing the reliability of

8 the identifications are persuasive.  The identification was reliable.

### 3. Conclusion

10     The identification of petitioner by the victim was not unnecessarily suggestive, and it

11 was reliable.  There was no due process violation; consequently, the rejections of this claim

12 by the state appellate courts were not contrary to, or unreasonable applications of, clearly-

13 established United States Supreme Court authority.

## II. Vouching

15     Quezada claims that the prosecutor committed misconduct by vouching for a

16 witness and that this violated his due process rights.  During closing arguments, defense

17 counsel attacked Ngo's description of his assailant: "[Ngo] said that this person was Asian.

18 But he also said . . . he didn't make any distinction in an Asian person's eyes than any

19 other race of a person.  Well, to me, that seems to be that the prosecution coached him to

20 an absurdity."  Reporter's Transcript Augmentation, ("RTA") at 27.  During the prosecutor's

21 rebuttal, she responded to the accusation of coaching by asking the jury to consider

22 whether she would "risk [her] position, [her] reputation...perhaps [her] license to practice, to

23 sit down with a victim during the lunch hour and coach him as to what to say."  RTA at 42.

24 The petitioner argues that these comments constituted prosecutorial misconduct in the

25 form of vouching for the credibility of a witness.

26     As to this issue, the California Court of Appeal concluded: "The prosecutor's

27 comments were not focused on Ngo's testimony but rather on defense counsel's argument

28 and suggestion that the prosecutor had coached him.  The prosecutor simply denied doing

so and asked jurors to wonder whether she would risk her reputation and job by coaching a witness. That response to defense counsel did not reasonably represent the prosecutor's personal assurance of Ngo's veracity or place the prestige of the district attorney's office behind Ngo, and we do not find a reasonable likelihood the jury understood the prosecutor's rebuttal in those ways. Accordingly, we find no misconduct." Ex. C at 13.

A prosecutor may not vouch for the credibility of a witness. *United States v. Moreland*, 604 F.3d 1058, 1066 (9th Cir. 2010). Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985); *United States v. Sanchez*, 176 F.3d 1214, 1224-25 (1999). Here, the main effect of the prosecutor's comment was not to vouch for the witness, but to defend herself from an attack.

The thrust of defense counsel's argument on this point was the unbelievability of the victim's testimony that he thought Hispanic people were Asians. The remarks about coaching flowed from the purported incredibility of the victim's testimony, and the coaching comment did not make the statement itself either more or less believable. The result is that the prosecutor's riposte did not tend to bolster the believability of the witnesses' testimony, and thus was not vouching.

Furthermore, only if vouching infects the trial with entire unfairness is the resulting conviction a violation of due process. *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (citation omitted). The purported vouching here, if there was any at all, was very indirect and could have added little or nothing to the victim's startling belief that Mexicans are Asians. The prosecutor's remarks did not so infect the trial with unfairness as to make the conviction a denial of due process. And at a minimum, the considerations discussed above mean that the state court's rejection of this claim could not have been contrary to, or an unreasonable application of, clearly established Supreme Court authority.

///

///

9

**III. Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability ("COA"). 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. 28 U.S.C. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons set out above, jurists of reason would not find the result regarding prosecutorial misconduct debatable or wrong. However, a certificate of appealability will be granted on the identification claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. A Certificate of Appealability also is **GRANTED** as to the identification claim. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 30, 2011.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.08\QUEZADA2421.RUL.wpd